IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

KYLE L. EIDSON,

    Defendant.

Case No. 5:18-CR-40023-HLT


UNITED STATES OF AMERICA,

    Plaintiff,

    v.

RUTH M. EIDSON,
f/k/a
RUTH M. MOLER-DOTTER,

    Defendant.

Case No. 5:18-CR-40026-HLT

**MEMORANDUM AND ORDER**

Defendants Kyle L. Eidson ("Kyle") and Ruth M. Eidson ("Ruth") (formerly Ruth M. Moler-Dotter)[1] are charged with violating 18 U.S.C. §§ 1708 and 1709 for allegedly taking Netflix DVDs out of United States Postal Service ("USPS") mail receptacles.[2] Kyle filed this motion to suppress (Doc. 22), arguing that no valid consent was given for the search of their home. Ruth

---

[1] Kyle and Ruth are now married and the Court will refer to them collectively as "the Eidsons" for purposes of this memorandum.

[2] Kyle was additionally charged with taking a gift card out of the mail, but that is not the subject of this motion.

joined the motion. Doc. 20 in Case 18-CR-40026. The Court held an evidentiary hearing on November 6, 2018 and heard testimony from the two USPS agents who conducted the search; Austin Childers ("Childers"), who was present at the house during the search; a private investigator hired by Ruth's defense counsel; and Kyle. The Court admitted several exhibits, including an audio recording of statements made to the investigator by Bobby Barrett ("Barrett"), the other man present in the house during the search.[3] Based on the evidence and arguments presented by the parties and upon review of the applicable law, the Court finds that the search was not unlawful under the Fourth Amendment and denies the motions.

I. BACKGROUND

In 2016, Kyle and Ruth worked as USPS contract highway route carriers on separate routes in Wabaunsee County, Kansas. Contract highway route carriers pick up mail from mail receptacles at smaller post offices and transport it to other post offices for processing. After an unusually high number of Netflix DVDs placed in mail receptacles on Kyle's and Ruth's routes were not received by Netflix, the USPS began an investigation. Special Agent Mike Corf ("Agent Corf") placed several test Netflix DVDs in the mail at the post offices on their routes. Agent Corf testified that none of the test DVDs mailed from the post office on Kyle's route were received by Netflix and most of them mailed from the post office on Ruth's route were not received.

On June 2, 2016, after receiving no responses to his telephone messages to Kyle and Ruth, Agent Corf and Assistant Special Agent in Charge Michael Ridley ("Agent Ridley") drove to their

---

[3] Barrett did not testify because Defendants could not obtain service of a subpoena on him. To the extent that his statements contradict those of other witnesses, the Court will grant less weight to them because they were unsworn statements and Barrett was not available for cross-examination. *See United States v. Matlock*, 415 U.S. 164, 175 (1974) (in suppression hearings, there is "no automatic rule against the reception of hearsay" but the judge has discretion in assigning it weight); *United States v. Miller*, 382 F. Supp. 2d 350, 362-63 (N.D.N.Y. 2005) (stating that the weight given an affidavit from a non-testifying defendant "will be influenced by whether the affidavit is contradicted by more cogent evidence, especially that which withstands the scrutiny of cross-examination").

home to do a "Knock and Talk." When Agent Corf knocked on the door, Childers answered it and Barrett joined him at the door. The agents showed their USPS identifications and told the men they wanted to talk to Kyle and Ruth about the missing Netflix DVDs. One of the men informed the agents that neither Kyle nor Ruth were home. After a discussion, the agents conducted a search of the entertainment center and nearby containers and found ninety-seven Netflix DVDs. After the agents took the DVDs and began walking toward their vehicle, Barrett came out of the house and handed Agent Corf five more DVDs that he said had been in a bedroom.

## II. STANDARD

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. The home "is accorded the full range of Fourth Amendment protections" because the expectation of privacy is "most heightened" in the home. *California v. Ciraolo*, 476 U.S. 207, 213 (1986); *Lewis v. United States*, 385 U.S. 206, 211 (1966). Thus, a search of a person's home without a warrant is presumed unreasonable unless the government can show that "one of a carefully defined set of exceptions" applies. *United States v. Cos*, 498 F.3d 1115, 1123 (10th Cir. 2007) (internal quotation and citation omitted). Consent is one such exception to the warrant requirement. *Id.* at 1124. To invoke this exception, the government must show that consent was voluntarily given by the owner of the property or by a third party having actual or apparent authority to give consent. *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 224 (1973) (voluntariness); *Matlock*, 415 U.S. at 171 (actual authority)). The necessary level of proof is a preponderance of the evidence. *United States v. Rith*, 164 F.3d 1323, 1328 (10th Cir. 1999).

**III. ANALYSIS**

The Eidsons argue that the DVDs seized from their home must be suppressed because neither Barrett nor Childers had actual or apparent authority to give consent to a search of the entertainment center or of the containers holding the DVDs. Doc. 22 at 5-6. For the reasons stated below, the Court disagrees.

**A. Authority to Consent**

Consent to a search is valid if it is voluntarily given by a person having actual or apparent authority to grant it. *Rodriguez*, 497 U.S. at 188. Actual authority exists where the consenting party is either the owner or a third party having "common authority over or other sufficient relationship to the premises or effects sought to be searched." *Matlock*, 415 U.S. at 171. Apparent authority exists where "a police officer reasonably, but erroneously, believes that the third party has actual authority to consent." *Cos*, 498 F.3d at 1128 (citing *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) and *Rodriguez*, 497 U.S. at 181).

The Court begins by analyzing apparent authority. For apparent authority, a court must consider whether "the facts available to the officer at the moment . . . 'warrant a man of reasonable caution' [to believe that] the consenting party had authority over the premises[.]" *Rodriguez*, 497 U.S. at 188 (quoting *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)). In evaluating apparent authority, courts use the framework of actual authority. *United States v. Bass*, 661 F.3d 1299, 1305 (10th Cir. 2011). A third party has actual authority to consent to a search if he has "either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it." *Rith*, 164 F.3d at 1329 (citing *Matlock*, 415 U.S. at 171 n.7). The Court addresses only the first inquiry—mutual use of the property by joint access—because the second does not apply here.[4] The first is a fact-

---

[4] The second inquiry is based upon a close relationship between the third party and the owner and the government does not assert that either man's relationship with either Kyle or Ruth would qualify. *See Cos*, 498 F.3d at 1125.

4

intensive inquiry focusing on whether the third party was allowed to enter the premises at will, without the consent of the defendant. *Id.* at 1330.

Based on the following evidence, the Court concludes the agents had sufficient facts before the search to form a reasonable belief that Barrett and Childers had authority to consent to the search. First, the Court finds that Barrett invited the agents in—a fact established by Barrett's statement in his interview and the testimony of both agents at the hearing.[5] Next, the Court finds that when the agents asked the men if they lived in the house, both Barrett and Childers said they did. Although Barrett and Childers dispute this point, the Court finds the agents' testimony to be credible on this point.[6] The agents' testimony is consistent with each other and is corroborated by notes that Agent Corf took at the time of the search. The notes list each man's name, his birth date, and an address. Agent Corf explained that the addresses were the men's previous addresses and that the notations "Beginning May" and "Month" indicated the length of time each man said he had been living at the Eidsons' home. The Court finds that explanation reasonable and credible. Finally, the agents are experienced investigators[7] and Agent Corf testified that if the men had stated

---

[5] The Court does not credit Childers's testimony on this point for the reasons stated below, *see infra* n. 6, and because it is inconsistent with the agents' testimony and Barrett's statement.

[6] For the reasons discussed herein, the Court finds the agents' independent accounts overall more credible. On both direct and cross-examination, the agents remained calm and professional and provided straightforward and unequivocal accounts of their encounter with Barrett and Childers. In contrast, Childers appeared defensive, was (at times) evasive on cross-examination, and overall gave the impression that he was attempting to mitigate the situation he had helped create that resulted in these charges against the Eidsons, with whom he had a long-standing friendship. Childers's testimony that neither he nor Barrett told the agents they lived in the house is inconsistent with even his own affidavit. Therefore, the Court generally does not credit Childers's testimony on this point. Because Barrett was not subject to cross-examination and his statement contradicts other credible evidence (e.g., Agent Corf's contemporaneous notes about where Barrett lived), the Court affords Barrett's recorded statements less weight on this issue.

[7] Agent Ridley testified he has eleven years' experience as a USPS special agent, and Agent Corf testified that he is aware of the need for accuracy in his reports because some prosecutions involve motions to suppress.

they did not live there, he would have simply left his business card with them and asked them to pass it on to Kyle and Ruth.

The agents testified that their observations of the living area gave them further reason to believe the men were living there. Agent Ridley testified that it appeared the men were sleeping on the couches and that he saw two duffle bags in the living area. Childers testified that one of the bags belonged to him and contained clothes and peanut butter. Childers also testified that Barrett had a duffle bag of clothes there. Keeping personal belongings in the home is an indicator of mutual use of the property by virtue of joint access. *See Cos*, 498 F.3d at 1127. Another indicator is how often the third party is left alone in the home without the defendant present. *Id*. Although the evidence did not specifically reveal how often Barrett and Childers were in the home alone, they were there alone when the agents arrived and Childers told the agents that he played PlayStation when Kyle and Ruth were gone. The Court finds the above facts sufficient to meet the government's burden to show, by a preponderance of the evidence, that the facts known to the agents would support a reasonable belief that Barrett and Childers were living in the house and had authority to consent to a search of the living area and entertainment center.

In reaching this conclusion, the Court rejects Kyle and Ruth's argument that the circumstances known to the agents before the search were ambiguous and therefore the agents had a duty to investigate further before relying on any consent (if consent was given). *See* Doc. 22 in 18-CR 40023, at 6-7 (citing *Cos*, 498 F.3d at 1128).[8] Kyle and Ruth do not suggest what ambiguities existed that would trigger such duty and the Court does not find ambiguous circumstances in the facts set out above.

---

[8] In *Cos*, the Tenth Circuit held that the officers failed to make sufficient inquiry of the woman who answered the door to the defendant's apartment where they did not ask her name, whether she lived there, or what her relationship was to the defendant. 498 F.3d at 1118.

### B. Scope of Consent

The Eidsons argue that, even if Barrett or Childers gave valid consent to a search of the entertainment center, they lacked authority to consent to a search of the nearby tins that contained many of the DVDs.[9] Doc. 22 at 7. It is well established that "[c]ommon authority over a residence does not necessarily imply common authority over all locations or objects within the residence." *Bass*, 661 F.3d at 1306 (citing *Randolph*, 547 U.S. at 112). In assessing whether a container was within the scope of a third party's authority, the "paramount concern" is "whether the defendant's reasonable expectation of privacy was infringed by the third party's consent to the search [of the container]." *Cos*, 498 F.3d at 1126. But if the owner has not taken "'special steps to protect [the contents] from the scrutiny of others'" and the container is in an area readily accessible to a co-inhabitant, courts have found that the owner has a reduced expectation of privacy in the container. *Bass*, 661 F.3d at 1306 (quoting 4 Wayne R. LaFave, Search and Seizure § 8.3(f) (4th ed. 2004)). In such circumstances, courts have found that the third party's authority extended to the container.

For example, in *Bass*, the Tenth Circuit found that the defendant's girlfriend's authority to consent to a search of the home extended to a zippered bag sitting near the sofa because the bag was "hardly an object shouting, 'Do Not Enter.'" *Id.* Likewise, here, the tins were not labelled in a way to suggest that others should not open them and they were not held shut by a lock or tape or other means. There was no testimony that the Eidsons had told Barrett and Childers not to open the tins. Further, the tins were sitting out in a common area of the home, on or near the entertainment center that Childers used even when the Eidsons were out. *See, e.g.*, *Andrus*, 483 F.3d at 719 (finding the wife's authority extended to a search of the defendant's computer in part

---

[9] Defendants argue that the government must establish that the consenting party shared the use of the container <u>and</u> had actual authority to consent to its search. Doc. 22 at 7 (citing *United States v. Salinas-Cano*, 959 F.2d 861, 864 (10th Cir. 1992)). The Tenth Circuit rejected this interpretation of *Matlock* in *Rith*. 164 F.3d at 1329.

because it was in a common area and she occasionally used it). Finally, the tins were of a size that could hold the DVDs that were the object of the search. *See Florida v. Jimeno*, 500 U.S. 248, 251 (1991) ("The scope of a search is generally defined by its expressed object."); *United States v. Kimoana*, 383 F.3d 1215, 1223 (10th Cir. 2004) ("Consent to search for specific items includes consent to search those areas or containers that might reasonably contain those items."). For these reasons, the Court finds that Barrett's and Childers's apparent authority to consent extended to the tins and that the ninety-seven DVDs taken from the living area and entertainment center were lawfully seized. The only issue remaining concerns the last five DVDs, which were not found during the agents' search of the living area.

### C. The Last Five DVDs

After the agents left the house, Barrett ran out to them and handed five Netflix DVDs to Agent Corf, telling him that he found them in the Eidsons' bedroom.[10] Although the Eidsons acknowledge that Agent Corf did not search the bedroom, they argue that the agents conducted a warrantless search and seizure of the DVDs when they took them from Barrett, returned to the office, photographed them, and attempted to trace the identifying numbers on them. Doc. 29 at 3-4.

These arguments fail because the DVDs are not the fruit of a government search or seizure. The Fourth Amendment protects only against unreasonable searches and seizures conducted by the government: "'it is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.'" *United States v. Benoit*, 71 F.3d 1, 10 (10th Cir. 2013) (quoting *United States v. Jacobsen,* 466 U.S. 109, 113 (1984)). A search by a private party

---

[10] Barrett stated this in his recorded interview and both agents testified to it as well.

"on his own initiative" does not invoke Fourth Amendment concerns unless "the private party acted as an instrument or agent of the Government." *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 614 (1989).[11] To establish that a private party was acting as an instrument or agent of the government, the defendant must show that (1) "the government knew of and acquiesced in the intrusive conduct, and (2) . . . the party performing the search intended to assist law enforcement efforts or to further his own ends." *United States v. Souza*, 223 F.3d 1197, 1201 (10th Cir. 2000) (internal citations and quotations omitted). A search by a private party will be deemed a government search if a government agent instigated, orchestrated, or encouraged the private party's action. *Id.* The defendant bears the burden of establishing a level of government involvement sufficient to transform a search by a private party into a government search. *United States v. Kennedy*, 81 F. Supp. 2d 1103, 1112 (D. Kan. 2000).

Here, no evidence was presented that the USPS agents knew that Barrett was looking for more DVDs, much less that they instigated, orchestrated, or encouraged Barrett to do so. Instead, the evidence showed that the agents first learned of Barrett's search—and the existence of more DVDs—when Barrett ran out of the house carrying them and gave them to the agents.[12] From these circumstances, the Court finds that Barrett was acting on his own initiative and not as an instrument or agent of the government when he obtained the DVDs and gave them to the agents. Thus, the five DVDs were not the fruit of a government search and there is no basis to suppress them.

The Court rejects the Eidsons' remaining arguments. First, it is irrelevant whether Barrett had actual or apparent authority to enter the bedroom. Even if he lacked authority, "'private

---

[11] *See also United States v. Smythe*, 84 F.3d 1240, 1242 (10th Cir. 1996) (stating that where the private party's decision to open a package was "entirely his [own]," no government search occurred, despite presence of police officer).

[12] Prior to this, the agents had no knowledge that more DVDs were in the house because one or both of the men in the house told the agents that all of the DVDs were in the living area around the entertainment center.

9

wrongdoing does not deprive the government of the right to use evidence that it has acquired lawfully.'" *United States v. Stratton*, 229 F. Supp. 3d 1230, 1239 (D. Kan. 2017) (quoting *Walter v. United States*, 447 U.S. 649, 656 (1980)).[13]

Next, the Court rejects the Eidsons' undeveloped and factually unsupported assertion that the agents' tracing of the serial numbers on the DVDs exceeded the scope of any search by Barrett. Barrett's search revealed DVDs owned by Netflix. Netflix assigns its DVDs serial numbers and that is the information the agents used to perform their investigation.[14] The Eidsons do not claim any expectation of privacy in those serial numbers and so cannot claim the protections of the Fourth Amendment. Even if the numbers were somehow private, "'[o]nce frustration of the original expectation of privacy occurs, the Fourth Amendment does not prohibit governmental use of the now-nonprivate information.'" *Id.* at 1238 (quoting *Jacobsen*, 466 U.S. at 117.)

In their last argument, the Eidsons assert that a Fourth Amendment seizure occurred when the agents accepted the five DVDs that Barrett handed to them. The argument fails because the Fourth Amendment is "'wholly inapplicable to a search or seizure'" conducted by a private party in the absence of affirmative action by the government. *Benoit*, 71 F.3d at 10 (quoting *Jacobsen*, 466 U.S. at 113). Mere "passive acceptance" of evidence from a private party does not implicate the Fourth Amendment. *Id.* at 11. Any other rule would cripple law enforcement investigations involving evidence voluntarily supplied by a private party.

---

[13] Courts have applied these principles to evidence such as stolen documents, *United States v. Shetty*, 171 F. App'x 561, 562 (9th Cir. 2006); *United States v. Knoll*, 16 F.3d 1313, 1319 (2d Cir. 1994), and items turned over to the government in contravention of the owner's express instructions, *United States v. Veatch*, 674 F.2d 1217, 1222 (9th Cir. 1981).

[14] *Compare Walter v. United States*, 447 U.S. 649, 658-59 (1980) (finding that government exceeded the bounds of the private party's search when it opened boxes and screened the films contained therein to determine they were obscene) *with United States v. Knoll*, 16 F.3d 1313, 1319 (2d Cir. 1994) (finding no Fourth Amendment violation where the government read papers that a private party had already searched after he stole them from an attorney's office).

## IV. CONCLUSION

Based on the above factual findings and analysis, the Court concludes that the search of the living area, entertainment center, and tins was lawful because Barrett and Childers had apparent authority to give consent and this authority extended to the tins. The Court further concludes there was no government search leading to the discovery of the last five DVDs and no government seizure of them. There is no basis to suppress any of the DVDs.

THE COURT THEREFORE ORDERS that Defendants' motions to suppress (Doc. 22 in 18-CR-40023 and Doc. 20 in 18-CR-40026) are DENIED.

IT IS SO ORDERED.

DATED: December 13, 2018

/s/ *Holly L. Teeter*
HOLLY L. TEETER
UNITED STATES DISTRICT JUDGE